COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                                  SUPERIOR COURT
                                                             C.A. NO.

DAVID PAIVA

       Plaintiff

v.

THE BANK OF NEW YORK MELLON                    **VERIFIED COMPLAINT**
FKA THE BANK OF NEW YORK AS                     **AND JURY DEMAND**
TRUSTEE FOR THE CERTIFICATE
HOLDERS CWALT, INC.
ALTERNATIVE LOAN TRUST 2005-
48T1, MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2005-48T1

       Defendant

## NATURE OF THE CASE

1.     This is an action brought by plaintiff David Paiva against defendant The

Bank of New York Mellon, as Trustee, for wrongful foreclosure of his home. The

foreclosure of Paiva's home is void as it violated the statutory power of sale for two

reasons: (1) because the notice of default was sent by the mortgage servicer, not the

"lender," as required by the terms of the mortgage; and (2) because no notice of the

foreclosure was sent to the Town of Berkley by the bank within 30 days, as required by

G.L. c. 244, § 15A.



1

## PARTIES

2.      Plaintiff David Paiva ("Paiva") is a natural person residing in Berkley, Bristol County, Massachusetts.

3.      Defendant The Bank of New York Mellon fka The Bank of New York as Trustee for the Certificate Holders CWALT, Inc. Alternative Loan Trust 2005-48T1, Mortgage Pass-Through Certificates, Series 2005-48T1 ("BNY") is a New York bank with principal offices located at One Wall Street, New York, New York.

## COMMON FACTS

4.      Paiva resides at the property at issue, 16R Seymour Street, Berkley, Bristol County, Massachusetts.

5.      Paiva acquired the home in August 1998 under a deed recorded in the North Bristol Registry of Deeds at book 7786, page 10.

6.      Paiva refinanced his mortgage in August 2005 with a loan from Countrywide Home Loans, Inc. in the amount of $381,000. The loan was secured by a mortgage in favor of Mortgage Electronic Registration Systems, Inc., as nominee for Countrywide Home Loans, Inc. The mortgage is recorded in the North Bristol Registry of Deeds at book 15124, page 187. (**Exhibit 1**, Mortgage.)

7.      The property has an assessed value of approximately $499,000. (**Exhibit 2**, Assessor Record.)

8.      Due to loss of income from his construction business, divorce, and health problems of his mother, Paiva fell behind on his mortgage payments.

9.      Paiva's financial difficulties have ended, and he has sufficient income to resume payments on his mortgage. Paiva could, for example, afford a loan modification.

2

10.     Nevertheless, the property was foreclosed on BNY April 15, 2014. The foreclosure deed is recorded in the North Bristol Registry of Deeds at book 21915, page 112. At the time of the foreclosure, Pavia had an application for a loan modification under review.

## COUNT I
### Mortgage Power of Sale

11.     Massachusetts permits non-judicial foreclosure under the statutory power of sale contained at G.L. c. 183, § 21, so long as the terms of the mortgage and the statutes related to power of sale are complied with. The statute states:

> Section 21. The following "power" shall be known as the "Statutory Power of Sale", and may be incorporated in any mortgage by reference:
>
> (POWER.)
>
> But upon any default in the performance or observance of the foregoing or other condition, the mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises or such portion thereof as may remain subject to the mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises then subject to the mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the mortgage, **first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale**, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity.

(Emphasis added.)

12.     As emphasized above, the foreclosure by power of sale requires that a foreclosing bank must "comply[] with the terms of the mortgage . . . ." G.L. c. 183, § 21.

13.     If a bank fails to strictly comply with the power of sale, then a foreclosure is void. *U.S. Bank Nat'l Ass'n v. Schumacher*, 467 Mass. 421, 428 (2014) ("Failure to comply strictly with the power of sale renders the foreclosure sale void.").

14.     Under the terms of Paiva's mortgage, the "lender" must send a notice of default advising him of certain facts before the mortgage may be accelerated. (**Exhibit 1**, Mortgage.)

15.     The servicer of Paiva's mortgage, ASC, sent a notice of default on May 19, 2008. (**Exhibit 3**, Notice of Default.)

16.     At the time the notice of default was sent, ASC was not the "lender" of the mortgage. Rather, the lender was BNY pursuant to an assignment of mortgage effective May 14, 2008. (**Exhibit 4**, Assignment.)

17.     Therefore, the notice of default was deficient, and the power of sale was not complied with prior to foreclosure. The foreclosure is therefore void.

18.     As a result of BNY's actions described below, Paiva suffered damages including emotional distress, loss of title to his home, court costs, and attorney fees.

## COUNT II
## G.L. c. 244, § 15A

19.     The preceding allegations are incorporated by reference.

20.     The statutes related to foreclosure under sale at G.L. c. 183, § 21, are contained at G.L. c. 244, §§ 11–17C.

21.     Failure to comply with any of these requirements voids a foreclosure sale. *U.S. Bank Nat'l Ass'n v. Schumacher*, 467 Mass. 421, 432 (2014) ("Where a [homeowner] claims that the mortgage holder failed strictly to adhere to the requirements

under the statutory power of sale set forth in G.L. c. 183, § 21, and the related

requirements in G.L. c. 244, §§ 11–17C, proof of *any* violation of these requirements will

void the foreclosure sale . . . .") (Gants, J., concurring) (emphasis in original).

22.     Under G.L. c. 244, § 15A, part of the power of sale, a mortgagee must

notify the city tax assessor or collector of the foreclosure within 30 days.

> Section 15A. **A mortgagee** taking possession of mortgaged premises prior
> to foreclosure or a mortgagee conveying title to mortgaged premises
> pursuant to the provisions of this chapter **shall, within thirty days of
> taking possession or conveying title, notify** all residential tenants of said
> premises, and **the office of the assessor or collector of taxes of the
> municipality in which the premises are located** and any persons,
> companies, districts, commissions or other entities of any kind which
> provide water or sewer service to the premises, of said taking possession
> or conveying title.

*Id.*

23.     BNY did not notify the Town of Berkley within 30 days of the

foreclosure.

24.     The Town of Berkley still lists Paiva as the owner in its property registry.

The "latest sale" according to Berkley's records, was in 2001, not the foreclosure sale

conducted in April 2014. (**Exhibit 2.**) This record is a true copy of the property record

card published by the Town of Berkley and obtained by plaintiff.

25.     BNY's failure to notify the Town of Berkley of the transfer violated G.L.

c. 244, § 15A.

26.     As a result, BNY did not strictly adhere to the foreclosure requirements

under the statutory power of sale. The foreclosure is therefore void.

## REQUEST FOR RELIEF

Plaintiff David Paiva hereby requests judgment in his favor, actual and compensatory damages, costs, interest, and attorney fees, and a judgment voiding the foreclosure sale of his home.

## JURY DEMAND

Plaintiff David Paiva hereby requests a trial by jury on all issues so triable.

Respectfully submitted,

Josef C. Culik (BBO #672665)
Sean R. Cronin (BBO# Pending)
CULIK LAW PC
18 Commerce Way, Suite 2850
Woburn, Massachusetts 01801
(617) 830-1795
(617) 830-1576 Fax
jculik@culiklaw.com
scronin@culiklaw.com

Attorneys for Plaintiff David Paiva

December 1, 2014

## VERIFICATION OF COMPLAINT

I, David Paiva, hereby swear under pains and penalty of perjury that the foregoing facts are true and correct based on my personal knowledge.

David Paiva


EXHIBIT
1

**RETURN TO**

BK 15124 PG 187
08/26/05 02:09 51791
PAGE 1 OF 12

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
CAROL L. EDWARDS

------------------ [Space Above This Line For Recording Data] ------------------

[Doc ID #]

# MORTGAGE
MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   AUGUST 25, 2005          , together with all Riders to this document.
**(B) "Borrower"** is
DAVID PAIVA

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada, Calabasas, CA 91302-1613
**(E) "Note"** means the promissory note signed by Borrower and dated  AUGUST 25, 2005          . The Note states that Borrower owes Lender
THREE HUNDRED EIGHTY ONE THOUSAND SIX HUNDRED and 00/100

Dollars (U.S. $ 381,600.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  SEPTEMBER 01, 2035 .
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**MASSACHUSETTS**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**

Page 1 of 11                    Initials: _____

VMP -6A(MA) (0401) CHL (01/04)(d)        VMP Mortgage Solutions (800)521-7291              Form 3022  1/01





DOC ID #:

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- ☐ Adjustable Rate Rider
- ☐ Condominium Rider
- ☐ Second Home Rider
- ☐ Balloon Rider
- ☐ Planned Unit Development Rider
- ☐ 1-4 Family Rider
- ☐ VA Rider
- ☐ Biweekly Payment Rider
- ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of BRISTOL :
[Type of Recording Jurisdiction]       [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:                                which currently has the address of

16R SEYMOUR ST, BERKLEY ,
[Street/City]
Massachusetts 02779-1125 ("Property Address)":
[Zip Code]



Initials:

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓▓▓

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.

Initials:

DOC ID #: ████████████

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Initials: _____

DOC ID #:

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials:

DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓▓

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Initials: _____

DOC ID #: ▓▓▓▓▓▓▓▓

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this

DOC ID #: ▮▮▮▮▮▮▮▮▮▮▮

Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

DOC ID #: ▮▮▮▮▮▮▮▮▮▮▮▮

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _____

▮▮▮▮ -6A(MA)(0401)    CHL (01/04)    Page 9 of 11    Form 3022 1/01

DOC ID #: ████████████████

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____   _____ (Seal)
                                   DAVID PAIVA                  -Borrower

_____   _____ (Seal)
                                                                -Borrower

                                   _____ (Seal)
                                                                -Borrower

                                   _____ (Seal)
                                                                -Borrower

COMMONWEALTH OF MASSACHUSETTS,     DOC ID #: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
*BRISTOL*     County ss:

On this *25TH* day of *AUGUST 2005*, before me, the undersigned notary public,
personally appeared

*DAVID PAIVA*

proved to me through satisfactory evidence of identification, which was/were *MA DRIVERS LICENSE*
to be the person(s) whose name(s) is/are signed on the preceding document, and acknowledged to me that
he/she/they signed it voluntarily for its stated purpose.
My Commission Expires: *7/9/2010*
(Seal)

Notary Public



File Number: 

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

The land situated in Berkley, Bristol County, Massachusetts, being Map 16, Lot 33, as shown on plan of land entitled "Plan of Land in Berkley, MA drawn for David & Denise Paiva, Date: May 5, 1999, Scale 1" = 50' Senna Fitzgerald Gilbert Associates, Civil Engineers & Land Surveyors, 28 Main Street, Lakeville, MA", which plan is recorded with Bristol County ND Registry of Deeds in Plan Book 382, Page 32.

Included in this conveyance is the fee in the land shown as "Driveway Easement" on the aforesaid plan, bounded according to said plan as follows:

Beginning at a point in Seymour Street, thence running 90 degrees 00 minutes 00 second 47.12 feet along the arc of a curve have a radius of 30.00'; thence running S. 36 degrees 33 minutes 01 second E. 166.00 feet by land now or formerly of Rarise to a point; thence continuing by land now or formerly of Paiva 66.50 feet to a point; thence turning and running S. 53 degrees 26 minutes 59 seconds W. still by land now or formerly of Paiva 52.93 feet to a point; thence turning and running N. 03 degrees 40 feet 00 seconds W. 23.82 feet still by land now or formerly of Paiva to a point; thence turning and running N. 36 degrees 33 minutes 01 seconds W. 212.50 feet by land now or formerly of Brosnan; thence running 90 degrees 00 seconds 00 minutes 47.12 feet along the arc of a curve having a radius of 30.00' to Seymour Street; thence along said Street N. 53 degrees 26 minutes 59 seconds E. 100.00 feet to the point of beginning.

Being the same premises conveyed to the herein named grantor(s) by deed recorded with the **Bristol** Registry of Deeds in Book 3490, Page 268.

"The Grantor(s) expressly reserve my/our rights of Homestead and do not wish to terminate my/our Homestead by granting the within conveyance notwithstanding my/our waiver of such homestead in the within mortgage"



**End of Document**



EXHIBIT

2

# Berkley Board of Assessors



Click Seal To Return

Search for Parcels

Parcel Features

Summary

Narrative

Detached Structure

Condo

Commercial

**Property Record Card**

Parcel ID :027/016.0-0033-0000.0        FY:2014        Community : Berkley



| SKETCH | PHOTO |
|---|---|
| Click on Sketch to Enlarge | Click on Photo to Enlarge |

16 R SEYMOUR ST EXT

| | | | |
|---|---|---|---|
| Location: | **16R SEYMOUR ST EXT** | | |
| Owner Name: | **Please visit the Berkley Assessor's Office for Owner Information** | | |
| Neighborhood: | 45 | Land Area: | **8.84 acres** |
| Use Code: | 101-SNGL-FAM-RES | Total Finished Area: | **2210 sqft** |

| ASSESSMENTS | CURRENT YEAR | PREVIOUS YEAR |
|---|---|---|
| Total Value: | 499,000 | 529,600 |
| Building Value: | 319,400 | 346,400 |
| Land Value: | 179,600 | 183,200 |
| Market Land Value: | 179,600 | |
| Chapter Land Value: | | |

| LATEST SALE | | | |
|---|---|---|---|
| Sale Price: | 1 | Sale Date: | 05/14/2001 |
| Arms Length Sale Code: | A-NO-FAMILY | Grantor: | PAIVA DAVID & DENISE |
| Cert Doc: | | Book: 9430 | Page: 268 |

Residential Property Record Card

PARCEL_ID:027/016.0-0033-0000.0  MAP:016.0  BLOCK:0033  LOT:0000.0  PARCEL ADDRESS:16R SEYMOUR ST EXT  FY:2014

| PARCEL INFORMATION | | Use-Code: | 101 | Sale Price: | 1 | Book: | 9430 | Road Type: | T | Inspect Date: | 05/10/2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Please visit the Berkley Assessors Office for Owner Information | | Tax Class: | T | Sale Date: | 05/14/01 | Page: | 268 | Rd Condition: | P | Meas Date: | 05/10/2005 |
| | | Tot Fin Area: | 2210 | Sale Type: | P | Cert/Doc: | | Traffic: | | Entrance: | E |
| | | Tot Land Area: | 8.84 | Sale Valid: | A | | | Water: | | Collect Id: | GM |
| | | | | Grantor: | PAIVA DAVID & DENISE | | | Sewer: | | Inspect Reas: | M |
| | | Exempt-B/L% | / | Resid-B/L% | 100/100 | Comm-B/L% | | Indust-B/L% | | Open Sp-B/L% | / |

| RESIDENCE INFORMATION | | | | Attic: | | NBHD CODE: 45 | | | | | LAND INFORMATION | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | NBHD CLASS: 0 | ZONE: R1 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Style: | CP | Tot Rooms: | 7 | Main Fn Area: | 1716 | Bsmt Area: | | Seg | Type | Code | Method | Sq-Ft | Acres | Influ-Y/N | Value | Class |
| Story Height: | 1.50 | Bedrooms: | 3 | Up Fn Area: | 494 | Fn Bsmt Area: | | 1 | P | 101 | A | 0 | 1.500 | | 117,165 | |
| Roof: | G | Full Baths: | 2 | Add Fn Area: | | Bsmt Grade: | A | 2 | R | 101 | A | 0 | 7.340 | | 62,390 | |
| Ext Wall: | WS | Half Baths: | | Unfin Area: | | | | | | | | | | | | |
| Masonry Trim: | | Ext Bath Fix: | | Tot Fin Area: | 2210 | | | DETACHED STRUCTURE INFORMATION | | | | | | | | |
| Foundation: | CN | Bath Qual: | T | RCNLD: | 240326 | | | Str | Unit | Msr-1 | Msr-2 | E-YR-Blt | Grade | Cond | %Good P/F/E/R | Cost | Class |
| | | Kitch Qual: | T | Mkt Adj: | 0.920 | | | S1 | S | 8 | 12.00 | 1999 | FA | FA | //74 | 1,100 | |
| Heat Type: | ER | Ext Kitch: | | Sound Value: | 221,100 | | | G1 | S | 48 | 60.00 | 2005 | G | G | //96 | 97,200 | |
| Fuel Type: | E | | | Cost Bldg: | | | | VALUATION INFORMATION | | | | | | | | |
| Fireplace: | 0 | Bsmt Gar Cap: | | Att Str Val1: | | | | Current Total: | 499,000 | | Bldg: | 319,400 | Land: | 179,600 | MktLnd: | 179,600 |
| Central AC: | | Bsmt Gar SF: | | Att Str Val2: | | | | Prior Total: | 529,600 | | Bldg: | 346,400 | Land: | 183,200 | MktLnd: | 183,200 |
| | | Att Gar SF: | | %Good P/F/E/R: | //85 | | | | | | | | | | | |

Eff Y Built: 1985
Year Built: 1984
Grade: AG
Condition: G
Pct Complete:

**Porch Area**

| Porch Type | Porch Area | Porch Grade Factor |
|---|---|---|
| P | 224 | |
| W | 672 | |

PHOTO



16 R SEYMOUR ST EXT

SKETCH



EXHIBIT
3

## COMMONWEALTH OF MASSACHUSETTS
## LAND COURT
## DEPARTMENT OF THE TRIAL COURT

09 MISC 394867

Bank of New York as

**Suffolk** _____ ss.

### MORTGAGEE'S AFFIDAVIT
Under Chapter 206 of the Acts of 2007
(as amended by Chapter 224 of the Acts of 2007)

Defendant(s)/Mortgagor(s):    <u>David Paiva</u>

Property Address:    <u>16R Seymour Street, Berkley, Bristol County (Northern District), Massachusetts</u>

1) The undersigned makes oath and says that it is (check one):

    ( )   The Mortgagee of the Mortgage which is the subject of this proceeding; or
    ( )   One who holds under the Mortgagee; or
    ( x )  One who is authorized to act by and on behalf of either the Mortgagee or one holding under the Mortgagee;

### AND

2) The undersigned further makes oath and says that (check one):

( x ) The undersigned or a prior holder of the Mortgage has caused to be mailed the Notice(s) to Defendant(s)/Mortgagor(s) in compliance with Section 11 of Chapter 206 of the Acts of 2007, as amended;

### OR

( ) Notice has not been sent because no notice is required under Section 11(e) of Chapter 206 of the Acts of 2007.

FEB 1 9 2009

Signed under the pains and penalties of perjury this _____ day of _____, 2009.

Plaintiff(s): Bank of New York as Trustee for the Certificate Holders CWALT, Inc. Alternative Loan Trust 2005-48T1 Mortgage Pass-Through Certificates, Series 2005-48T1 By: Countrywide Home Loans Servicing, LP

By:

Name: _____

Title:   Kathy Repka, Asst. Secretary

 
**Countrywide**
HOME LOANS

P.O. Box 660694
Dallas, TX 75266-0694

Send Correspondence to:
P.O. Box 5170,MS SV314B
Simi Valley, CA 93065

Send Payments to:
P.O. Box 660694
Dallas, TX 75266-0694

Business Address:
450 American Street
Simi Valley, CA 93065-6285

David Paiva
16R SEYMOUR ST
BERKLEY, MA 02779
IlllmnlIdulldlulllmnlmlulhldldhlmlldldnl

05/19/2008

RE: Premises:
16r Seymour St
Berkley, MA 02779
Account No.:

### NOTICE OF INTENTION TO FORECLOSE

Dear David Paiva:

Countrywide Home Loans Servicing LP (hereinafter "Countrywide") services the loan described above on behalf of the holder of the promissory note (the "Noteholder"). The loan is in serious default because the required payments have not been made. The total amount now required to reinstate the loan as of the date of this notice is as follows:

| | | |
|---|---|---|
| **Monthly Charges:** | 04/01/2008 |  |
| **Late Charges:** | 04/01/2008 | $____ |
| **Other Charges:** | Total Late Charges: | $____ |
| | Uncollected Costs: | $____ |
| | Partial Payment Balance: | ($____) |
| | **TOTAL DUE:** | $____ |

You have the right to cure the default. To cure the default, on or before August 17, 2008, Countrywide must receive the amount of $____ plus any additional regular monthly payment or payments and late charges which become due on or before August 17, 2008.

The default will not be considered cured unless Countrywide receives "good funds" in the amount of $____ on or before August 17, 2008. If any check (or other payment) is returned to us for insufficient funds or for any other reason, "good funds" will not have been received and the default will not have been cured. No extension of time to cure will be granted due to a returned payment. Countrywide reserves the right to accept or reject a partial payment of the total amount due without waiving any of its rights herein or otherwise. For example, if less than the full amount that is due is sent to us, we can keep the payment and apply it to the debt but still proceed to foreclosure since the default would not have been cured.

If the default is not cured on or before August 17, 2008, the mortgage payments will be accelerated with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings will be initiated at that time. As such, the failure to cure the default may result in the foreclosure and sale of your property. If your property is foreclosed upon, the Noteholder may pursue a deficiency judgment against you to collect the balance of your loan, if permitted by law, and all occupants will be required to vacate the property.

You may, if required by law or your loan documents, have the right to cure the default after the acceleration of the mortgage payments and prior to the foreclosure sale of your property if all amounts past due are paid within the time permitted by law. However, Countrywide and the Noteholder shall be entitled to collect all fees and costs incurred by Countrywide and the Noteholder in pursuing any of their remedies, including but not limited to reasonable attorney's fees, to the full extent permitted by law. Further, you may have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and foreclosure.

Your loan is in default. Pursuant to your loan documents, Countrywide may, enter upon and conduct an inspection of your property. The purpose of such an inspection are to (i) observe the physical condition of your property, (ii) verify that the property is occupied and/or (iii) determine the identity of the occupant. If you do not cure the default prior to the inspection, other actions to protect the mortgagee's interest in the property (including, but not limited to, winterization, securing the property, and valuation services) may be taken. The costs of the above-described inspections and property preservation efforts will be charged to your account as provided in your security instrument.

Please write your account number on all checks and correspondence.
We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

Account Number:
David Paiva
16r Seymour St

- Make your check payable to Countrywide Home Loans
- Write your account number on your check or money order
- Write in any additional amounts you are including (If total is more than $5000, please send certified check)
- Don't attach your check to the payment coupon
- Don't include correspondence
- Don't send cash

Balance Due for charges listed above: $____ as of 5/19/2008.

Please update e-mail information on the reverse side of this coupon.

| | |
|---|---|
| Additional Principal | |
| Additional Escrow | |
| Other | |
| Check Total | |

BLOKUMA

Countrywide
PO BOX 660694
Dallas, TX 75266-0694
IlllmnlIdmllmldldulhllmlldldmnlllmll



1122824921000005690490005690049

If you are unable to cure the default on or before August 17, 2008, Countrywide wants you to be aware of various options that may be available to you through Countrywide to prevent a foreclosure sale of your property. For example:

- **Repayment Plan:** It is possible that you may be eligible for some form of payment assistance through Countrywide. Our basic plan requires that Countrywide receive, up front, at least ½ of the amount necessary to bring the account current, and that the balance of the overdue amount be paid, along with the regular monthly payment, over a defined period of time. Other repayment plans also are available.

- **Loan Modification:** Or, it is possible that the regular monthly payments can be lowered through a modification of the loan by reducing the interest rate and then adding the delinquent payments to the current loan balance. This foreclosure alternative, however, is limited to certain loan types.

- **Sale of Your Property:** Or, if you are willing to sell your home in order to avoid foreclosure, it is possible that the sale of your home can be approved through Countrywide even if your home is worth less than what is owed on it.

- **Deed-In-Lieu:** Or, if your property is free from other liens or encumbrances, and if the default is due to a serious financial hardship which is beyond your control, you may be eligible to deed your property directly to the Noteholder and avoid the foreclosure sale.

If you are interested in discussing any of these foreclosure alternatives with Countrywide, you must contact us immediately. If you request assistance, Countrywide will need to evaluate whether that assistance will be extended to you. In the meantime, Countrywide will pursue all of its rights and remedies under the loan documents and as permitted by law, unless it agrees otherwise in writing. Failure to bring your loan current or to enter into a written agreement by August 17, 2008 as outlined above will result in the acceleration of your debt.

Also, applicable law requires the disclosure of the following information:

- The mortgage broker(s) associated with this loan are/were [we were unable to ascertain this information].

- The mortgage loan originator(s) associated with this loan are/were [we were unable to ascertain this information].

- You may be eligible for assistance from the Massachusetts Housing Finance Agency by calling 1-888-995-HOPE (www.masshousing.com), and the Massachusetts Division of Banks at 1-617-956-1501, ext. 501., or at 1-800-495-2265, ext. 501.

- You are hereby notified that a NEGATIVE CREDIT REPORT reflecting on the Borrower's credit record may be submitted to a credit reporting agency if the Borrower fails to fulfill the terms of the obligations under the loan.

- If you did not sign the note but hold a legal or beneficial interest in the encumbered property, this notice is provided to you as a courtesy to warn you that if the full amount due on the loan is not paid as set forth above, you may lose your interest in the encumbered property.

Time is of the essence. If you have any questions concerning this notice, or if you disagree with our calculation of the amount required to cure the default, please contact Loan Counseling Center immediately at 1-800-641-5302. Our office hours are between 8:00 A.M. and 5:00 P.M. Pacific Time.

Sincerely,

Loan Counseling Center

Bk: 19321 Pg: 101



EXHIBIT

4

Bk: 19321 Pg: 101  Page: 1 of 2
Doc: ASGT  02/18/2011 01:00 PM

## CORPORATE ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED
"MERS", Mortgage Electronic Registration Systems, Inc., a separate corporation that is acting
solely as nominee for "Lender", Countrywide Home Loans, Inc. and  its successors and assigns

HEREBY GRANTS, ASSIGNS AND TRANSFERS TO:
Bank of New York as Trustee for the Certificate Holders CWALT, Inc. Alternative Loan Trust
2005-48T1 Mortgage Pass-Through Certificates, Series 2005-48T1
c/o Countrywide Home Loans Servicing LP
7105 Corporate Drive
Plano, TX  75024

ALL OF ITS RIGHT TITLE AND INTEREST UNDER THAT CERTAIN MORTGAGE TO "MERS",
Mortgage Electronic Registration Systems, Inc., a separate corporation that is acting solely as
nominee for "Lender", Countrywide Home Loans, Inc. and  its successors and assigns dated August
25, 2005

EXECUTED BY David Paiva

RECORDED IN BOOK 15124, PAGE 187 OF OFFICIAL RECORDS IN THE REGISTRY OF DEEDS
OF BRISTOL COUNTY (NORTHERN DISTRICT), IN THE STATE OF MASSACHUSETTS.

Property Address:  16R Seymour Street, Berkley, Massachusetts

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE
MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS
ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE/MORTGAGE. THIS
ASSIGNMENT IS MADE WITHOUT RECOURSE, REPRESENTATION OR WARRANTIES.

This Assignment shall be effective as of May 14, 2008.

DATED: 2/27/09

Bk: 19321 Pg: 102

"MERS", Mortgage Electronic Registration Systems,
Inc., a separate corporation that is acting solely as
nominee for "Lender", Countrywide Home Loans,
Inc. and its successors and assigns

BY: _____

Name:   Donald Clark, Asst. Vice President
Title:

STATE OF TEXAS

Collin, ss.

ON FEB 2 7 2009 BEFORE ME, THE UNDERSIGNED NOTARY PUBLIC PERSONALLY
APPEARED    DONALD CLARK        PERSONALLY KNOWN TO ME (OR PROVED TO
ME ON THE BASIS OF SATISFACTORY EVIDENCE WHICH WAS
_____) TO BE THE PERSON(S) WHOSE NAME(S) IS/ARE SUBSCRIBED
IN THE WITHIN INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE/SHE/THEY
EXECUTED THE SAME IN HIS/HER/THEIR AUTHORIZED CAPACITY(IES), AND THAT BY
HIS/HER/THEIR SIGATURE(S) ON THE INSTRUMENT THE PERSON(S), OR THE ENTITY UPON
BEHALF OF WHICH THE PERSON(S) ACTED, EXECUTED THE INSTRUMENT AND SWORE
THAT IT WAS THEIR FREE ACT AND DEED.

WITNESS MY HAND AND OFFICIAL SEAL:

NOTARY SIGNATURE: 
MY COMMISSION EXPIRES:  MAY 0 5 2010

JORGE VARGAS
My Commission Expires
May 5, 2010

Mortgage Broker Information:
Countrywide Home Loans, Inc.
1600 Golf Road, Third Floor
Rolling Meadows, IL  60008
Lic. No.:  Unknown

END OF DOCUMENT

Bk: 21915 Pg: 109

2014 00003428?
Bk: 21915 Pg: 109  Page: 1 of 2
Doc: PATTY  10/02/2014 01:53 PM
ATTEST: Barry J. Amaral, Register
Bristol County North Registry of Deeds

### *Power of Attorney*

KNOW ALL MEN BY THESE PRESENT, that The Bank of New York Mellon fka The Bank of New York as Trustee for the Certificate Holders CWALT, Inc. Alternative Loan Trust 2005-48T1, Mortgage Pass-Through Certificates, Series 2005-48T1, the present holder of a mortgage given by David Paiva to "MERS", Mortgage Electronic Registration Systems, Inc., a separate corporation that is acting solely as nominee for "Lender", Countrywide Home Loans, Inc. and its successors and assigns dated August 25, 2005 recorded with Bristol County (Northern District) Registry of Deeds, Book 15124, Page 187, does hereby constitute and appoint James Peterson and/or Peter V. Guaetta and/or Audrey G. Benson and/or Sarah T. Fitzpatrick and/or Jennifer Norman of 73 Princeton Street, Suite 212, North Chelmsford, MA 01863, its true and lawful attorney, to make an entry and enter bids at the auction of said property for the purpose of foreclosing said mortgage and it and in its name, place and stead, to execute, acknowledge and deliver any instrument in connection therewith, including any deed or foreclosure deed and any closing documents required in a subsequent sale to a third party, with respect to said mortgage and the premises secured thereby. We further ratify any and all previous actions taken by the said James Peterson and/or Peter V. Guaetta and/or Audrey G. Benson and/or Sarah T. Fitzpatrick and/or Jennifer Norman with regard to the above mortgagor.

IN WITNESS THEREOF, the said Residential Credit Solutions, Inc., attorney-in-fact for The Bank of New York Mellon fka The Bank of New York as Trustee for the Certificate Holders CWALT, Inc. Alternative Loan Trust 2005-48T1, Mortgage Pass-Through Certificates, Series 2005-48T1 has caused its corporate seal to be hereto affixed and these present to be signed and acknowledged in its name and behalf by ___Therese Pfullmann___ , its ___Assistant Vice President - Servicing___ (title), thereunto duly authorized this ___September___   25   , 2014.

**RETURN TO**

GUAETTA AND BENSON, LLC
P.O. Box 519
Chelmsford, MA 01824-0519

Bk: 21915 Pg: 110

The Bank of New York Mellon fka The Bank of
New York as Trustee for the Certificate Holders
CWALT, Inc. Alternative Loan Trust 2005-
48T1, Mortgage Pass-Through Certificates,
Series 2005-48T1
By Its Attorney-in-Fact:
Residential Credit Solutions, Inc*

By:   Therese Pfullmann                    , its
      Assistant Vice President - Servicing    (title)

*For authority of Residential Credit Solutions, Inc. on behalf of The Bank of New York Mellon fka The
Bank of New York as Trustee for the Certificate Holders CWALT, Inc. Alternative Loan Trust 2005-
48T1, Mortgage Pass-Through Certificates, Series 2005-48T1 see Power of Attorney recorded herewith.

## ACKNOWLEDGMENT

State of  Texas
County of  Tarrant

On  09/ 25 /2014          before me,  Rebecca Parlegreco - Document Execution Specialist ,
                                      (Insert name and title of the officer)

Personally appeared          Therese Pfullmann - Assistant Vice President - Servicing
Who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of  Texas     that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature  Rebecca Parlegreco (Seal)
           Rebecca Parlegreco

REBECCA PARLEGRECO
Notary Public, State of Tex
My Commission Expire-
June 18, 2018

REBECCA PARLEGRECO
Notary Public, State of Texas
My Commission Expires
June 18, 2018

END OF DOCUMENT

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                        SUPERIOR COURT
                                                    C.A. NO.

DAVID PAIVA

      Plaintiff

v.

THE BANK OF NEW YORK MELLON          **PLAINTIFF'S EMERGENCY**
FKA THE BANK OF NEW YORK AS           **MOTION FOR LIS PENDENS**
TRUSTEE FOR THE CERTIFICATE
HOLDERS CWALT, INC.
ALTERNATIVE LOAN TRUST 2005-
48T1, MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2005-48T1

      Defendant

Pursuant to G.L. c. 184, § 15, plaintiff David Paiva moves the Court to grant a memorandum of lis pendens because of the wrongful foreclosure of his home. As further grounds, Paiva relies on the following memorandum of law.

## MEMORANDUM OF LAW

1.     Chapter 184, § 15 of the Massachusetts General Laws sets forth the procedure that allows court authorization for the filing of a memorandum of lis pendens where the subject matter of a pending lawsuit "constitutes a claim of a right to title to real property or the use or occupation thereof or of the buildings thereon." G.L. c. 184, § 15(b). *Shrewsbury v. Seaport Partners Ltd. P'ship*, 63 Mass. App. Ct. 272 (2005).

2.     The purpose of the lis pendens statute is to provide notice to prospective purchasers of the existence of a lawsuit which may affect the title to property in the same

1

manner as a record encumbrance at the relevant registry of deeds. *Debral Realty, Inc. v. DiChiara*, 383 Mass. 559 (1981).

3.      A party may move ex parte for a memorandum of lis pendens under the statute. *See* G.L. c. 184, § 15(b) ("If the memorandum is approved ex parte, it shall contain an additional finding that either (1) the defendant is not then subject to the jurisdiction of the court in that action, or (2) there is a clear danger that the defendant, if notified in advance of the endorsement of the memorandum, will convey, encumber, damage or destroy the property or the improvements thereon") (emphasis added).

4.      If the memorandum of lis pendens is not approved, the Court should issue a temporary restraining order. *See* G.L. c. 184, § 15(b) ("the court on its own motion may decline to endorse the memorandum of lis pendens, if the court does order the temporary equitable relief as will preserve the status quo pending further proceedings.").

5.      Here, however, Paiva merely requests a memorandum of lis pendens, which, as opposed to a restraining order, is *not* a seizure of property as "a memorandum of lis pendens does not result in seizure of the property or dispossession of the property owner." *Debral Realty*, 383 Mass. at 563.

6.      Additionally, the standard for issuing a lis pendens does not require demonstration by Paiva of a likelihood of ultimate success on the merits at trial. Rather, it only requires that the plaintiff assert that the subject matter of the action constitutes a claim of a right to title to or use and occupation of real property—a standard which has been described as giving "little discretion to the judge" once that determination has been made. *Sutherland v. Aolean Dev. Corp.*, 399 Mass. 36, 41 (1987).

7.      Here, Paiva's lawsuit plainly relates to a claim of title to or use and occupancy of property under G.L. c. 184 because his home was wrongfully sold at a foreclosure auction. Even if the proof of this claim somehow eludes him at trial, this is not the standard under the statute which governs the right to seek authorization of a lis pendens. After all, a lis pendens is not an attachment or encumbrance upon real estate, but rather simply a mechanism for providing notice to third parties of what is already on the public record, the existence of a lawsuit. *Debral Realty*, 383 Mass at 345. Since this action does involve such a claim relating to real estate which stands in the name of defendant, the less onerous standard under G.L. c. 184, § 15 is met, and the authorization for recordation of the lis pendens should be allowed. *See Wolfe v. Gormally*, 440 Mass. 699, 705 (2004).

8.      In fact, defendant BNY has started eviction proceedings and could sell Paiva's home to a third party any time, depriving him of the opportunity to rescind the sale.

9.      A lis pendens was allowed in a similar situation in *Speleos v. BAC Home Loans Servicing, LP*, 755 F. Supp. 2d 304, 312 (D. Mass. 2010), in which homeowners were foreclosed upon by Fannie Mae. The foreclosure was alleged to be unlawful, thereby voiding the sale. The bank denied that the foreclosure was improper. Under state law, the homeowners alleged, the mortgagee had no right to foreclose. After the foreclosure, during the litigation, the homeowners moved for a lis pendens. Allowing the lis pendens, the Court held "The Plaintiffs seek relief . . . in the form of an order rescinding the foreclosure sale of the Property and restoring title to them. This, the subject matter of the action constitutes a 'claim of right to title' to the Property and the

Plaintiffs' motion for issuance of a memorandum of lis pendens will be allowed." *Id.* at 312.

      10.    In the present case, Paiva similarly alleges that BNY foreclosed unlawfully while he was under consideration for a loan modification. Thus, his motion for a lis pendens should be allowed.

      WHEREFORE, Paiva request that the Court allow his motion for a lis pendens and endorse the attached proposed Memorandum of Lis Pendens. (**Exhibit 1.**)

Respectfully submitted,

Josef C. Culik (BBO #672665)
Sean R. Cronin (BBO# Pending)
CULIK LAW PC
18 Commerce Way, Suite 2850
Woburn, Massachusetts 01801
(617) 830-1795
(617) 830-1576 Fax
jculik@culiklaw.com
scronin@culiklaw.com

Attorneys for Plaintiff David Paiva

December 1, 2014

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon each

party appearing pro se and the attorney of record for each other party by first-class mail,

postage prepaid, and by fax.

> Shawn M. Masterson
> Shapiro Dorry Masterson, LLC
> 145 Waterman St.
> Providence, RI 02906

Sean R. Cronin

# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                         SUPERIOR COURT
                                                    C.A. NO.

DAVID PAIVA

      Plaintiff

v.

THE BANK OF NEW YORK MELLON          **MEMORANDUM**
FKA THE BANK OF NEW YORK AS          **OF LIS PENDENS**
TRUSTEE FOR THE CERTIFICATE
HOLDERS CWALT, INC.
ALTERNATIVE LOAN TRUST 2005-
48T1, MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2005-48T1

      Defendant

Notice is hereby given that on December 2, 2014 a verified complaint was filed in

the Bristol Superior Court, civil action no. _____ in which

David Paiva is named as plaintiff, and in which Bank of New York Mellon, as Trustee, is

defendant. The complaint affects the title to a certain parcel of land with the buildings

thereon located at 16R Seymour Street, Berkley, Bristol County, Massachusetts 02779,

and with title recorded in the North Bristol Registry of Deeds in Book 21915, Page 112.


_____          _____
Superior Court Justice                   Date

16R Seymour Street, Berkley, Bristol County, Massachusetts 02779